# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

NANCY LYNN HOWES,

      Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. C14-4067-MWB

**REPORT AND
RECOMMENDATION**

———————————

    Plaintiff Nancy Lynn Howes seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for Social Security Disability benefits (DIB) and Supplemental Security Income benefits (SSI) under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). Howes contends that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled during the relevant period. For the reasons that follow, I recommend that the Commissioner's decision be affirmed.

## I.    BACKGROUND

    Howes was born in 1964 and has a high school education. AR 25, 148, 1045. As of April 16, 2013, she was working up to six hours a week at a fast-food restaurant. AR 1086. She had previously worked as a kitchen helper/dishwasher, fast food worker, housekeeping cleaner and cook's helper, but that work was determined to not qualify as past relevant work. AR 25, 329.

Howes filed her applications for DIB and SSI on April 23, 2009, alleging a disability onset date of June 10, 1999.[1] AR 148-49.  She contends that she is disabled due to hip pain on both sides, two herniated discs, arthritis, scoliosis, arthritis in the left shoulder and neck, problems lifting, shortness of breath due to asthma, seizures three times a month due to hormone imbalance and chronic diarrhea.  AR 171.  Howes' claims were denied initially and on reconsideration.  AR 111-14, 116-19.  She then requested a hearing before an Administrative Law Judge (ALJ) and ALJ Ronald Lahners conducted a hearing on August 16, 2010 (the First Hearing).  AR 109, 1039-79.  Howes and a vocational expert (VE) testified.  AR 1039-79.  On August 27, 2010, the ALJ issued a decision denying Howes' claim.  AR 35-41.

Howes sought review by the Appeals Council, which granted review and remanded the case to the ALJ for further proceedings.  AR 28-31, 79-80, 81.  On April 16, 2013, the ALJ conducted a supplemental hearing (the Second Hearing), at which Howes and a VE again testified.  AR 1080-1119.  The ALJ issued a new decision on May 24, 2013, finding that Howes was not disabled at any time from April 1, 2009, through the date of the decision.  AR 16-27.  Howes sought review with the Appeals Council, which denied review on May 30, 2014.  AR 8-10, 12.  The ALJ's second decision thus became the final decision of the Commissioner.  AR 8; 20 C.F.R. §§ 404.981, 416.1481.

On July 28, 2014, Howes filed a complaint (Doc. No. 3) in this court seeking review of the Commissioner's decision.  This case has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition.  The parties have briefed the issues and the matter is now fully submitted.

## II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

---

[1] Howes later amended the alleged onset date to April 1, 2009.  AR 35, 1043.

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see also* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-

(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.

*Id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must show not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### III. ALJ'S FINDINGS

The ALJ made the following findings:

(1)   The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

(2)   The claimant has not engaged in substantial gainful activity since April 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)   The claimant has the following severe impairments: Degenerative disk disease of the lumbar spine; scoliosis; asthma; history of seizure disorder; and adjustment disorder (20 CFR 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except as follows:

She could frequently lift up to 10 pounds, but really should not lift more than that; nor should she carry more than that. In an 8-hour day, she could stand for 2 hours and could sit for 6 hours. One of the medical records said that claimant could do about one-half of normal stooping and bending; it is reasonable to expect that one-half of normal would be occasional stooping and bending. She really should not kneel, crawl, crouch, or squat. She certainly should not be climbing any kind of ladder or scaffold.

She could do simple work, but could not deal with complex instructions, either carrying them out or understanding them. She could complete a normal workday and workweek without interruptions from psychologically based problems and could complete a normal workday without an unreasonable number of breaks and rest periods; so, normal rest periods and normal breaks would be sufficient.

She could continuously use the right hand for reaching, fingering, feeling, as well as the left. She should not operate foot controls – should not use her feet to operate foot controls. She should stay away from open machinery and heights. She should work in an environment where there is not exposure to wetness, humidity, dust, and odors. With regard to any seizure activity, apparently that has been reduced to very stable to maybe once a year, and it sounds like it's just a short petit mal seizure and is not unconscious; she indicates she is just out for a very very short time when she can't think about what's going on but then pops right back. Her grip strength is 5 and 5. As far as environment goes, the limitations given above would place her inside because she should not be working outside.

(6)     The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on March 4, 1964 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

(8)     The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1564 and 416.964).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 404.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 18-26.


## IV.     THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without

being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## V.    DISCUSSION

Howes argues the ALJ's decision is flawed for three reasons:

1.    The ALJ failed to include certain mental limitations in the RFC determination.

2.    The ALJ failed to properly question the VE.

3.    The ALJ failed to properly evaluate Howes' subjective allegations.

I will address these arguments separately below.

### A.    RFC Determination

#### 1.    Applicable Standards

The claimant's RFC is "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a)(1). "The ALJ must determine a claimant's RFC based on all of the relevant evidence." *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004). This includes "an individual's own description of [her] limitations." *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). The claimant's RFC "is a medical question," *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001), and must be supported by "some medical evidence." *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam). The medical evidence should address the claimant's "ability to function in the workplace." *Lewis*, 353 F.3d at 646. At step four, the claimant has the burden to prove his RFC and the ALJ determines the RFC based on all relevant evidence. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004).

The ALJ is not required to mechanically list and reject every possible limitation. *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011). Furthermore, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "[T]he ALJ may reject the conclusions of any medical expert,

whether hired by a claimant or by the government, if inconsistent with the medical record as a whole." *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). The RFC must only include those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004).

### 2. *The ALJ's Findings*

The ALJ found that Howes had the RFC to perform sedentary work. AR 20. He included the following mental limitations:

> She could do simple work, but could not deal with complex instructions, either carrying them out or understanding them. She could complete a normal workday and workweek without interruptions from psychologically based problems and could complete [sic] a normal workday without an unreasonable number of breaks and rest periods; so, normal rest periods and normal breaks would be sufficient.

*Id.* In reaching this conclusion, the ALJ gave great weight to the state agency's consultants' opinions, finding that they were consistent with other substantial medical evidence of record. AR 21-22, 24. The ALJ noted that one of the consultant's opinions was less restrictive – finding an RFC for light work – than the ALJ's findings, as the ALJ concluded that Howes can perform only sedentary work. AR 22.

The ALJ gave also gave great weight to the opinion of Michael Baker, Ph.D., who saw Howes for a consultative psychological examination. *Id.* The ALJ noted that Dr. Baker was both an acceptable medical source and an examining source and concluded that his opinion was based on clinical findings and was consistent with other substantial medical evidence. *Id.* The ALJ also referenced a consultative evaluation performed by Denis Marandola, Ph.D., and findings made by a treating social worker, Verna Halligan, LISW. AR 23-24. However, he did not state the weight he gave to the findings and opinions of these sources.

### 3. *The Medical Evidence*

The record contains evidence from (a) Scott Schafer, Ph.D., (b) Beverly Westra, Ph.D., (c) Dr. Baker, (d) Ms. Halligan, (e) Dr. Marandola, (f) Michael Brenner, M.D., (g) Ryan Clauson, M.D., and (h) Jon Taylor, M.D. The record also contains Howes' subjective testimony. Howes' argument focuses on the mental health providers' opinions, which are discussed in detail below.

***Dr. Schafer.*** Dr. Schafer is a state agency consultant who reviewed records and prepared a written psychiatric review technique and mental RFC assessment dated April 18, 2008. AR 363-80. He found moderate difficulties in maintaining concentration, persistence and pace. AR 373. He reported that Howes was moderately limited in her abilities to (a) understand and remember detailed instructions, (b) carry out detailed instructions and (c) maintain attention and concentration for extended periods and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 377-78. He noted that Howes completed high school with special education assistance and was diagnosed with adjustment disorder with mixed anxiety and depressed mood, dependent personality traits and borderline intellectual functioning at a mental health center in 2001. AR 379. He concluded that despite Howes having a serious mental impairment, she was able to continue working part time, her mental health status was maintained with treatment and her activities of daily living did not indicate limitations. *Id.* He also found that Howes retained the ability to understand, remember and follow through with simple two and three-step instructions, had the attention, concentration and pace to complete simple tasks not requiring sustained attention, could interact appropriately with the public, coworkers and supervisors and her judgment was adequate to adjust to changes in the workplace. *Id.*

***Dr. Westra.*** Dr. Westra, also a state agency consultant, reviewed records and completed a mental RFC assessment dated July 1, 2009. AR 403-06. She found that Howes was moderately limited in her abilities to (a) maintain attention and concentration

for extended periods and (b) complete a normal workweek and workday without interruptions for psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 403-04. Dr. Westra reported that Howes had a long history of mental health issues, but no hospitalizations, and was not on medication for any mental health issues. AR 405. Dr. Westra also noted that Howes has a diagnosis of unspecified adjustment disorder with anxiety, along with a rule-out diagnosis of dependent personality. *Id.* In summarizing Howes' mental RFC, Dr. Westra concluded that while Howes may have limitations during times of depressive symptoms preventing sustained functioning at highly skilled tasks, she is capable of simple routine task that do not require sustained levels of concentration. *Id.*

*Dr. Baker.* While Dr. Baker evaluated Howes on three separate occasions dating back to 2005, only one of those evaluations occurred during the relevant time. AR 417-21, 426-29, 607-09. On April 8, 2009, Dr. Baker performed a Psychodiagnostic Mental Status Exam. AR 607-09. He noted that Howes engaged in various activities of daily living, including taking daily walks, showering and bathing, cooking supper, watching television, playing video games, laundry, household routine cleaning, shopping and working in the lobby at Wendy's. AR 608. With regard to her mental status, Dr. Baker stated Howes had a positive affect, congruent to normal mood. *Id.* He also noted Howes denied hallucinatory activities, psychotic indices, suicidal ideation, panic attacks, OCD symptoms, phobic problems or generalized anxiety. *Id.* Howes' thought process was sufficiently linear and goal-oriented without looseness of association and Dr. Baker detected no delusional thoughts. *Id.* He stated that Howes was able to conduct "serial sevens" without error, recalled three of four items after a five minute interval and had good responses to judgment items. *Id.* Dr. Baker assigned a Global Assessment Functioning (GAF) score of 55 and found that Howes could handle cash benefits on her

own.[2]  *Id.*  He also concluded she had the ability to sufficiently remember and understand locations, procedures and instructions and sufficient maintenance of attention, concentration and pace for carrying out instructions.  *Id.*  Dr. Baker noted her friendly and appropriate interactions and concluded there was no reason to expect that she would not use good judgment in dealing with workplace changes.  AR 609.

*Ms. Halligan.*  Ms. Halligan began treating Howes in January 2008 and has treated her consistently throughout the relevant time.  AR 441-456, 795-836.  On March 10, 2009, she conducted a therapy session with Howes and noted that Howes felt better about herself when she worked.  AR 444.  Ms. Halligan noted that Howes had adjustment disorder with mixed anxiety and depressed mood.  AR 445.  At that time, Ms. Halligan assigned a GAF score of 50.[3]  *Id.*  In most of her other sessions, Ms. Halligan noted Howes' self-esteem was normal, her affect was congruent to her mood and to the topics discussed, her appearance was normal and clean and she had no apparent abnormalities in her motor activity, suicidal thoughts, hallucinations or delusions, but regularly assigned the same GAF score at 50.  AR 441, 796-835.  Howes' last session with Ms. Halligan was August 15, 2010.  AR 796, 1007.

On October 27, 2009, Ms. Halligan conducted an updated assessment and social history examination.  AR 817-22.  During that assessment, Howes stated that her self-esteem was a 4 out of 10, she had trouble with mood swings, difficulty sleeping and problems related to social environment including isolation from society, no friends and no involvement in social clubs or activities.  AR 818-19, 821.  Howes also stated that

---

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school or occupational settings, not including impairments due to physical or environmental limitations.  *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM–IV).  A GAF score of 51 to 60 indicates moderate symptoms.  *Id*.

[3] A GAF score of 41 to 50 indicates the individual has serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational or school functioning (*e.g.*, no friends, unable to keep a job).  *See* DSM–IV at 34.

her appetite and concentration were good and she denied having suicidal thoughts, homicidal ideation, hallucinations or delusions. *Id.* Howes stated she enjoyed working as it motivated her to keep going, and that she also enjoyed playing video games, listening to music and watching movies. AR 819. Ms. Halligan noted that Howes' judgment was good, she had no memory problems, her appearance was normal, her affect was congruent to mood and to the topics discussed and that she had never been hospitalized for mental health issues or referred to a psychiatrist for treatment. AR 818. Ms. Halligan listed Howes' strengths as including: "'Good common sense'; hard worker; dependable; well-focused; friendly." AR 821. Howes limitations included: "Mood swings; diminished motivation; health problems." *Id.* Ms. Halligan again assigned a GAF score of 50. *Id.*

*Dr. Marandola.* On January 7, 2013, Dr. Marandola conducted a consultative psychological evaluation. AR 1006-16. She assessed Howes' limitations and abilities to remember and understand instructions, procedures and locations, carry out instructions, maintain attention, concentration and pace, interact appropriately with supervisors, co-workers and the public, use good judgement and respond appropriately to changes in the work place. AR 1006. Dr. Marandola noted that Howes had not been in therapy since 2010 and stated that her therapy at that time was centered on parenting skills and mood problems related to her struggle raising her daughter in a safe environment. AR 1006-08. During the evaluation, Howes denied having any current issues with depression, appetite or sleep and claimed her typical mood was "upbeat". AR 1008-09. Howes also denied having any issues with concertation, attention or decision-making and claimed her energy levels were normal. AR 1009. Howes stated she did not have suicidal or homicidal ideation or history of hallucinations. *Id.* Howes also stated she was able to care for her own hygiene, did the laundry, was able to cook and clean, shop for groceries and manage her own money. AR 1009-10.

Dr. Marandola reported that Howes had normal cognitive processing and that she was able to perform registration, recall, naming, repetition, comprehension, reading,

writing and drawing tasks without error. AR 1010. She diagnosed Howes with nicotine dependence and assigned a GAF score of 58. *Id.* She concluded that Howes would have little difficulty with her ability to remember and understand instructions, procedures and locations, as long as those instructions, procedures and locations were not complex. *Id.* Dr. Marandola also found that Howes' attention and concentration were good, her pace of cognitive processing and motor movement were within normal limits and Howes would be able to carry out instructions and maintain attention and concentration. *Id.* She concluded that Howes may have trouble interacting appropriately with supervisors, coworkers and the public because Howes is loud, somewhat exaggerated in affect and has no teeth. AR 1010-11. However, Dr. Marandola noted that Howes was friendly and personable, has been able to maintain employment at the same fast-food restaurant for 10 years and is reliable. *Id.* Finally, Dr. Marandola concluded that Howes had a history of good judgment, would likely respond appropriately to changes in a work environment and would be able to manage cash benefits herself. AR 1011.

### 4.    *Analysis*

Howes argues that the ALJ failed to incorporate certain limitations into her mental RFC and as a result, improperly found her to be not disabled. Specifically, Howes argues the ALJ failed to include limitations in maintaining concentration, persistence or pace, her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and her ability to perform at a consistent pace without an unreasonable number and length of rest periods. Howes notes that both state agency psychological consultants (Dr. Shafer and Dr. Westra) concluded that she had some limitations in these areas and argues that their conclusions were entitled to greater weight.

The Commissioner contends that the ALJ properly accounted for all mental limitations evidenced in the record. She argues that the opinions of Dr. Shafer and Dr. Westra as to Howes' concentration, persistence or pace were accounted for in the ALJ's Step Two determination that Howes had a severe mental impairment. The Commissioner

points out that both physicians concluded, in their mental RFC assessments, that Howes had no significant limitations that would affect her ability to work. The Commissioner also contends that the other medical evidence of record supports these conclusions and that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

After carefully reviewing the record, I agree with the Commissioner and find that the ALJ's RFC determination is supported by substantial evidence. The ALJ gave great weight to the opinions of Dr. Baker, Dr. Marandola and the two state agency consultants, noting that all four providers came to similar conclusions regarding Howes' mental limitations. AR 22, 24. That is, while Howes has mental health impairments, she is not significantly limited, in terms of her ability to work, by these impairments. AR 379, 405, 609, 1011. Each provider concluded that Howes would be capable of understanding and carrying out simple instructions, particularly those that did not involve sustained levels of concentration. *Id.* Drs. Schafer, Baker and Marandola also concluded that Howes would have the ability to interact with the public, supervisors and coworkers and would be able to adequately adjust to changes in the workplace. *Id.* While Drs. Schafer and Westra noted in their summary conclusions that Howes had a moderate limitation in her ability to complete a normal workday or week without unreasonable interruptions, neither included any such limitation in their mental RFC assessments. AR 378, 379, 403, 405. Nor did Dr. Baker or Dr. Marandola suggest that Howes would need additional breaks or rest due to her mental impairments. In fact, Dr. Baker noted Howes' ability to engage in various activities of daily living without significant limitations from her mental impairments. AR 608.

The ALJ presumably gave Ms. Halligan's findings little weight but did not expressly say so. AR 23. The ALJ did note that Ms. Halligan consistently assigned Howes a GAF score of 50, regardless of her improvement or deterioration from session to session. *Id.* In fact, Ms. Halligan did not deviate from that GAF score during the entire year she treated Howes. AR 793-836. Moreover, Ms. Halligan reported that

Howes' only limitations were mood swings, diminished motivation and health problems. AR 821. She did not suggest Howes had limitations in her ability to concentrate or would need additional breaks. In fact, Ms. Halligan noted that Howes' strengths included dependability, being a hard worker, having good common sense and being well-focused. *Id.*

In determining that Howes is able to perform sedentary work, the ALJ incorporated those limitations suggested by the mental health providers that the ALJ found to be supported by the medical evidence in the record. AR 20. Indeed, and as the ALJ noted, he included more restrictive limitations than those found by the state agency consultants. AR 22. I conclude that the ALJ's RFC findings are supported by substantial evidence on the record as a whole.

## B.    *The VE's Testimony*

The ALJ found Howes had no past relevant work. AR 25. The ALJ posed a hypothetical question to the VE to determine, as Step Five, whether Howes could perform work available in the national economy in light of her RFC, age, education and work experience. AR 25-26, 1110-14. The VE testified that an individual with the characteristics described by the ALJ could perform unskilled, sedentary work, such as unskilled bookkeeping work, office general clerking or receptionist type work. AR 1113.

Howes argues that the VE's testimony does not constitute substantial evidence supporting a finding that she can perform work in the national economy. First, she claims the hypothetical question posed to the VE did not incorporate the necessary mental limitations. Doc. No. 14 at 12. Second, Howes argues that the ALJ erred because he did not ask the VE whether his testimony was consistent with the *Dictionary of Occupational Titles* (DOT). *Id.* Finally, Howes argues the DOT occupation number the VE provided for each job do not correspond to the appropriate job description in the DOT. Doc. No. 14 at 12-15. She alleges these failure require remand.

### 1. *Applicable Standards*

The Commissioner has the burden at Step Five to show that "the claimant is able to perform other work in the national economy in view of her age, education, and work experience." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). The Commissioner may use a VE's response to a properly formulated hypothetical question to show that jobs exist in significant numbers for a person with the claimant's characteristics. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e); *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005). The purpose of the VE's testimony is to "determine whether jobs exist for someone with [the] claimant's precise disabilities." *Jelinek v. Bowen*, 870 F.2d 457, 459 (8th Cir. 1989).

In order to constitute substantial evidence that other jobs exist in the national economy, a VE's testimony must be based on a hypothetical question that includes all the claimant's impairments. *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010); *Brachtel v. Apfel*, 132 F.3d 417, 420 (8th Cir. 1997). This can be accomplished by "[capturing] the concrete consequences of those impairments" and limiting the "universe of work" the claimant can do. *Id.* (internal citation omitted). Only the impairments the ALJ has found credible must be included in the hypotheticals. *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 19 (D.D.C. 2009).

An ALJ errs if he or she fails to ask whether the VE's testimony is consistent with the DOT. *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007). If there is conflict between the VE's testimony and the demands listed in the DOT, the VE must explain it. *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007). Generally, the DOT controls but may be rebutted if the VE can show that the cited jobs are ones the claimant can actually perform. *Montgomery v. Chater*, 69 F.3d 273, 276 (8th Cir. 1995); *see also Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000) ("To the extent that there is any implied or indirect conflict between the vocational expert's testimony and the DOT . . . the ALJ may rely upon the [VE's] testimony provided that the record reflects an adequate basis for doing so."). However, if no conflict actually exists between the VE's testimony

and the DOT, an ALJ's failure to ask if the VE's testimony is consistent with the DOT is harmless error that does not require remand. *Renfrow*, 496 F.3d at 921.

### 2.    Analysis

#### a.    The Hypothetical Question

Howes first argues that the ALJ erred by failing to incorporate certain mental limitations in the hypothetical questions posed to the VE.  In particular, she contends that the questions should have incorporated moderate limitations in her ability to complete a normal work-day and work-week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Doc. No. 14 at 11-12.  I have already determined, however, that the ALJ's RFC, which omitted those mental limitations, is supported by substantial evidence.  Thus, I must reject Howes' argument.  The hypothetical questions posed during the Second Hearing properly included all the limitations that the ALJ found credible.  AR 1111-14.  As such, the VE's testimony in response to that hypothetical question would normally constitute substantial evidence supporting the ALJ's Step Five finding.  *Husley*, 622 F.3d at 922.

#### b.    Alleged Inconsistencies with the DOT

Next, Howes notes that the ALJ failed to ask the VE if his testimony was consistent with the DOT and argues that this failure requires remand because conflicts do, in fact, exist.  In particular, Howes relies on the following answer that the VE provided to the ALJ's hypothetical question:

> With that hypothetical, Your Honor, there would be... a fairly wide range of unskilled, sedentary work.  Some examples would be unskilled bookkeeping type work, a sample DOT number is 219.587-010, and in the state of Iowa there would be about 900, nationally about 70,000.  And she'd also be able to do receptionist type work, a sample DOT number is 237.362-014, in the State of Iowa in the sedentary exertion category there'd be about 800, nationally about 84,000.  And she'd also be able to do office general

clerking, sample DOT number is 205.367-030, in the state of Iowa there'd be about 900 in sedentary, and nationally about 97,000. These are all unskilled jobs.

AR 1113-14. According to Howes, the conflicts arise from the fact that the DOT occupation number provided for "bookkeeping" actually refers to the job of "parimutiel ticket checker" while the DOT occupational number provided for "office clerk" refers to "election clerk." Moreover, Howes states that the DOT occupation number provided for "receptionist" does not exist within the DOT.[4] Howes argues that these alleged inconsistencies require remand.

The Commissioner contends that the VE simply provided examples of jobs within general types of work that the hypothetical individual could perform. I agree. Indeed, I do not know how the VE's testimony could be clearer on this point. He started the answer by stating that the individual could perform a "fairly wide range of unskilled, sedentary work." AR 1113. He then explained that "[s]ome examples" are (1) "unskilled bookkeeping type work," indicating that a "sample DOT number" within that type of work is 219.587-010, (2) "receptionist type work," indicating that "a sample DOT number" within that type of work is 237.362-014, and (3) "office general clerking," indicating that a "sample DOT number" within that type of work is 205.367-030.    *Id.*

The VE did not, as Howes argues, testify that "bookkeeping," "receptionist" or "office general clerking" are specific occupations listed in the DOT. Instead, he used those terms to describe categories of work and, for each, then provided a sample DOT occupation within that category. *Id.* While the VE provided an incorrect DOT number for the "receptionist" category, the sample DOT numbers he provided for the other categories are consistent with the VE's answer to the hypothetical question. According to the DOT, the job of "parimutuel ticket checker" involves such activities as counting

---

[4] The Commissioner concedes that the DOT job number 237.362-014 is not a correct number, as it does not correspond to a valid DOT job. Doc No. 15 at 13. It is undisputed, however, that the other two DOT job numbers provided by the VE do correspond to DOT occupations.

and recording the number of tickets cashed at the track to verify cashiers' records and comparing totals with entries on the daily balance sheet. *See* DOT 219.587-010, 1991 WL 671989. This is consistent with the VE's testimony that this is "bookkeeping type work." AR 1113.

The DOT states that work as an "elections clerk" involves such activities as compiling and verifying voter lists from official registration records, requesting voter identification at polling places, obtaining signatures and recording names of voters, distributing ballots to voters, counting ballots and preparing official reports. *See* DOT 205.367-030, 1991 WL 671719. Again, this is consistent with the VE's testimony that this job falls within the category of "general clerking." AR 1113. With regard to both jobs, the VE correctly identified the exertional levels as sedentary and the skill levels as unskilled.[5] *Id.*

Thus, even disregarding the VE's testimony about "receptionist type" work, the VE identified two categories of work that the hypothetical individual could perform and, for each, provided a sample DOT occupation. The VE testified that with regard to those two categories, there are a total of 1,800 jobs available in Iowa and 167,000 jobs available nationally. AR 1113. These totals exceed the number of jobs required to satisfy the requirement that the Commissioner identify a "significant number of jobs." *See, e.g., Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (200 jobs in Iowa and 10,000 jobs in the national economy).[6]

---

[5] According to the DOT, both jobs have a specific vocational preparation level ("SVP") of 2, meaning they can be learned within one month. *See* DOT 219.587-010, 1991 WL 671989; DOT 205.367-030, 1991 WL 671719. Both jobs thus fall within the Commissioner's definition of "unskilled work." *See* 20 C.F.R. §§ 404.1568(a), 416.968(a).

[6] Howes correctly notes that the Seventh Circuit Court of Appeals has expressed doubt about the manner in which vocational experts estimate the number of available jobs. *See, e.g., Herrmann v. Colvin*, 772 F.3d 1110, 1113-14 (7th Cir. 2014). In this circuit, however: "The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Guilliams*, 393 F.3d at 804 (citing 20 C.F.R. §§ 404.1566(e), 416.966(e) and *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997)). Unless and until the Eighth Circuit adopts the

While the ALJ did not ask the VE if his testimony was consistent with the DOT, Howes has not identified a conflict that impacts the ALJ's Step Five determination. Even disregarding the one erroneous occupation number provided by the VE, the VE described two specific occupations, within two broad categories of job types, that the hypothetical individual could perform. The VE further testified that such jobs exist in sufficient numbers as to constitute a "significant number of jobs." Howes has not shown that the VE's testimony about these jobs is contrary to the DOT. As such, the ALJ's failure to ask the VE if his testimony was consistent with the DOT was harmless error that does not require remand. *Renfrow*, 496 F.3d at 921.

## C.    *Subjective Allegations*

Howes argues the ALJ failed to properly consider her subjective allegations. She contends the ALJ discredited those allegations because he incorrectly relied on her activities of daily living and the fact that medical treatment helped ease her symptoms briefly. She further contends that if her subjective allegations had been afforded the proper weight, a finding of disability would have been mandated. The Commissioner argues that the ALJ properly analyzed Howes' subjective allegations as to her limitations and pain, as well as the other record evidence, including the medical evidence, which supports discounting her allegations.

### 1.    *Applicable Standards*

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence."

---

Seventh Circuit's position, an ALJ's finding that a significant number of jobs exists will be supported by substantial evidence if it is based on a VE's testimony.

*Guilliams*, 393 F.3d at 801 (8th Cir. 2005). An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.* "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

To determine a claimant's credibility, the ALJ must consider:

(1)    the claimant's daily activities;

(2)    the duration, intensity, and frequency of pain;

(3)    the precipitating and aggravating factors;

(4)    the dosage, effectiveness, and side effects of medication; and

(5)    any functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "Other relevant factors include the claimant's relevant work history, and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). An ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010).

The ALJ is not required "'to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints.'" *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (quoting *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). If an ALJ discounts a claimant's subjective complaints, he or she is required to "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Ford v. Astrue*, 518 F.3d 979, 982 (quoting *Lewis*, 353 F.3d at 647). When an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court should normally defer to the ALJ's credibility determination. *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). It is not the court's role to re-weigh the evidence. *See* 42 U.S.C. § 405(g); *see*

*also Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) ("[I]f, after reviewing the record, [the Court] find[s] that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the decision of the Commissioner.") [citations and quotations omitted].

### 2.     The ALJ's Findings

The ALJ noted:

> In February 2012, the claimant reported her daily activities include caring for her personal needs; washing dishes, dusting, doing laundry, and cooking, with breaks as necessary; preparing simple meals; and watching television. She was working at Wendy's two days per week, from 12:00 to 3:00 p.m. She walked or took the bus to work. She took short walks nearly daily.... She said working two days per week helped with stiffness....

AR 24. The ALJ found that these activities of daily living indicate only mild restrictions. AR 19. The ALJ also found that the medical evidence did not support Howes' subjective allegations of disabling pain. AR 25. In fact, the ALJ noted that Howes testified "that after the epidural steroid injection she received in February 2012, she had no pain for six months." *Id.* The ALJ concluded that Howes' pain relief was likely longer than six months as she did not have another injection. *Id.* Finally, the ALJ noted that Howes had not stopped smoking cigarettes, despite alleging disabling breathing problems. *Id.* He found that her unwillingness to try to quit smoking was inconsistent with her testimony and allegations that she could not work because of her breathing problems. *Id.*

### 3.     Analysis

Here, the ALJ explicitly discredited Howes' subjective allegations of completely disabling pain and provided reasons for doing so. AR 24-25. The ALJ first discussed Howes' activities of daily living, explaining that she engages in activities exceeding what someone who had completely disabling pain would be capable of doing. AR 19, 24-25. Indeed, Howes testified that she works in Wendy's lobby one or two day a week as the

"runaround girl," cleaning bathrooms, wiping tables and refilling condiment dispensers. AR 1086-87. She also testified that she takes walks to help relax, takes baths to relieve her back pain, cooks meals, cleans her house, does laundry and cares for her personal needs. AR 1091, 1093. While a claimant does not need to prove herself completely bedridden to be found disabled, the ALJ was permitted to find that Howes' ability to engage in these activities is inconsistent with her complaint of disabling pain. *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005); *Medhoug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("cooking, vacuuming, washing dishes, doing laundry, shopping driving, and walking, are inconsistent with subjective complaints of disabling pain.").

Next, the ALJ discussed the fact that Howes' back pain was relieved through a steroid injection. AR 25. Howes testified that the February 2012 steroid injection reduced her back pain to a level of 1 out of 10 for six months or more. AR 1101. In fact, Howes stated it was "like turning over a new page," that she experienced relief the day after the shot and that she could do more after the shot. AR 1101-02. Howes argues that the ALJ should not have relied on her testimony – which she now calls "wishful thinking" – but instead should have relied on the April 18, 2012, report of Ryan Clauson, M.D., a consultative examining physician. Doc. No. 14 at 16. Dr. Clauson wrote that the injections helped and the pain was intermittently controlled, yet still rated at a level of 5 out of 10. AR 936. According to Howes, this indicates that the injection treatment was not successful.

Howes' argument is misplaced. The ALJ did not overlook Dr. Clauson's report. Indeed, the ALJ largely adopted that report, noting that his own physical RFC findings either reflected Dr. Clauson's findings or were actually more limiting than Dr. Clauson's findings. AR 23-24. Like Dr. Clauson, the ALJ found that Howes could frequently lift and carry only up to 10 pounds; stand for only 2 hours and sit for 6 hours in a workday; never operate foot controls; occasionally stoop; and never climb ladders and scaffolds. AR 20, 944-947. However, while Dr. Clauson found that Howes could also occasionally

kneel, crouch and crawl, the ALJ concluded that she should never perform these postural activities.  AR 20, 947.

Because it is clear that the ALJ was aware of Dr. Clauson's report, the issue is whether the ALJ erred in giving more weight to Howes' own testimony, during the Second Hearing, that the injection treatments eliminated her back pain for at least six months.  Howes cites no authority for the proposition that an ALJ cannot rely on a claimant's own testimony as to the beneficial effects of treatment.  Here, the ALJ weighed the evidence and found Howes' testimony about the pain relief she experienced from injection treatments to be probative on that issue.  As noted above, it is not the court's role to re-weigh the evidence.

In short, the ALJ provided good reasons, supported by substantial evidence in the record as a whole, for his assessment of Howes' credibility.  As such, the ALJ's credibility determination is entitled to deference.

## VI.    CONCLUSION AND RECOMMENDATION

For the reasons set forth herein, I RESPECTFULLY RECOMMEND that the Commissioner's determination that Howes was not disabled be **affirmed** and that judgment be entered against Howes and in favor of the Commissioner.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Civ. P. 72.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise*, 588 F.3d 561, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 24th day of August, 2015.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE